In re: **CENTURY OFFSHORE MANAGEMENT CORPO-RATION, Debtor.**

**GRASSO PRODUCTION; Air Logistics Incorporated, Appellants,**

v.

**BMO FINANCIAL INCORPORATED; Bank of Montreal, Appellees.**

No. 95–5492.

United States Court of Appeals, Sixth Circuit.

Submitted April 9, 1996.

Decided May 7, 1996.

---

Richard J. Reynolds (briefed), Schober, Reynolds & Antee, Shreveport, LA, for appellants.

Candance S. Schiffman (briefed), and Alan Shore Gover, Weil, Gotshal & Manges, Houston, TX, for appellees.

Before: MERRITT, Chief Judge; MILBURN, Circuit Judge; O'MALLEY, District Judge.*

MERRITT, Chief Judge.

This case involves the priority under Louisiana law of liens on certain oil and gas properties owned by Century Offshore Management Corporation, the debtor in a Chapter 11 bankruptcy proceeding that began in August 1993 before Bankruptcy Judge Joe Lee. In December 1993, the Bank of Montreal and BMO Financial, Inc. (collectively, the "Bank"), secured creditors of Century with consensual mortgages and security interests

on substantially all of the oil and gas properties owned by Century, filed a complaint in the bankruptcy proceeding seeking to determine the validity, extent, and priority of their mortgages. Based on discovery and pleadings, the Bank moved for summary judgment that its mortgages were senior in rank to all other claimants. Appellants, Grasso Production Management and Air Logistics, Inc., opposed the Bank's summary judgment motion, and asserted, as they do on this appeal, that they hold statutory lien claims on certain of Century's oil and gas properties that are superior in priority to the consensual mortgages held by the Bank. Grasso claimed $774,301.73 in unpaid services due it as "contract operator" of certain oil and gas facilities. Air Logistics claimed $410,272.92 for transportation services to and from these offshore facilities. Thus the case involves claims in excess of $1 million. In four short sentences delivered from the bench about the needs of commercial banks, the Bankruptcy Judge found in favor of the Bank. The District Court affirmed.

The issue presented by this appeal is whether mechanic's and materialman's liens under the Louisiana Oil, Gas, and Water Wells Lien Act rank from the date services were first provided or from the date of first unpaid service. At the outset, we note that, although this issue is one of first impression in Louisiana, the decision of this Court will have little prospective effect. As described below, 1995 amendments to the Oil, Gas, and Water Wells Lien Act make clear that statutory liens rank from the date services were first provided, not the date of first unpaid service. However, because the 1995 amendments do not appear to be retroactive, this Court must decide this case based on the older Lien Act.

Under the pre–1995 Oil, Gas, and Water Wells Lien Act, oil and gas well contractors are granted a "privilege" (i.e. a lien) in the well and its proceeds for the value of their labor. The Act states, in relevant part:

> Any person who performs any labor or service in drilling or in connection with the

* The Honorable Kathleen M. O'Malley, United States District Court for the Northern District of Ohio, sitting by designation.

drilling of any well or wells in search of oil, gas or water ... has a privilege on all oil or gas produced from the well or wells, and the proceeds thereof inuring to the working interest therein ... for the amount due for labor or service.....

La.Rev.Stat. 9:4861 (1996) (Historical and Statutory Notes). To preserve the privilege granted by § 4861, a contractor must record a notice of claim in the appropriate parish records within 180 days after the last day of the performance of labor or services. La. Rev.Stat. 9:4862(A)(1) (1996) (Historical and Statutory Notes).

When so recorded, the privileges are superior to all other privileges, mortgages, or other security interests against the property, except ... privileges or mortgages filed or recorded ... prior to the date on which the first labor ... covered by the privilege herein granted is furnished.

La.Rev.Stat. 9:4862(A)(2) (1996) (Historical and Statutory Notes).

■ The Bank's argument, accepted by both the Bankruptcy and District Courts, is relatively simple. Because a contractor has a privilege under 9:4861 only "for the amount due" for labor or service, the privilege only comes into existence on the date of the first *unpaid* invoice for labor or services. Until an amount is due, no privilege exists. Once a privilege exists, it will be superior to other mortgages except those recorded prior to the date of the first unpaid invoice, because under § 4862(A)(2) the first invoice marks the first labor "covered by the privilege herein granted." Thus, under the Bank's reading of §§ 4861 and 4862, the Bank has priority if its mortgage is recorded prior to the contractor's first unpaid invoice. The summary judgment evidence shows that Appellants filed all of their invoices at least eighteen months after the Bank had recorded its mortgages.

While the Bank's statutory reading is plausible, it is not the most straightforward interpretation of the relevant provisions. Section 4862 establishes the rank date as the date on which "first labor ... is furnished." The "covered by the privilege herein granted" language more logically modifies "first labor" to mean that only the types of labor listed in

§ 4861 (i.e. drilling or operating wells; constructing, operating, or repairing flow lines; trucking, towing, or barging; furnishing fuel, rigs, machinery, equipment, material, or supplies) can be used to establish a rank date. For example, a contractor's labor that goes into preparing a bid or surveying a site would not lead to a privilege or to a rank date, even though subsequent labor of the type specified in § 4861 might. From a policy standpoint this makes sense: all of the types of labor listed in § 4861 are visible to an observer of the physical well site. If a site is in operation, a lender will know that certain contractors will have prior claims. Conversely, lenders who extend funds before a well opens will know that no statutory privileges exist, and that any encumbrances will be reflected in the public records. Read this way, the Oil, Gas, and Water Wells Lien Act is similar to other statutory grants of mechanic's liens, which give priority to liens on the basis of first visible work. *See, e.g.,* La.Rev.Stat. 9:4801 *et seq.* (Louisiana Private Works Act).

The Bank makes a policy argument that oil and gas well projects are very different from ordinary construction projects. Oil and gas wells can operate for twenty years or more, and the labor and services involved are not as noticeable by simple visual inspection as are those of other projects. Ordinary construction projects are short term and involve fewer contractors; prudent lenders have an easier time determining the priority status of their consensual liens and less chance of being primed by an unrecorded statutory lien. The Bank would find it onerous to review the accounts payable records from the inception of an oil or gas well (potentially twenty years worth of records) and to investigate every vender who ever provided labor or services. If priority is only given for *unpaid* services, on the other hand, a lender will be able to more readily determine the risks involved.

The Bank is wrong that it would have to consider up to twenty years worth of records. Section 4862(A)(1) of the old Lien Act requires a notice of claim to be recorded within 180 days after the last day of performance of labor or service in order for the privilege to

be preserved. And, under § 4865, a privilege is extinguished if "(1) The claimant or holder of the privilege does not preserve it as required by R.S. 9:4862; or (2) The claimant or holder of the privilege does not institute an action thereon within one year after the date of recordation of notice of the privilege." La.Rev.Stat. 9:4865 (1996) (Historical and Statutory Notes). *See Louisiana Materials Co., Inc. v. Atlantic Richfield Co.*, 493 So.2d 1141, 1147 n. 6 (La.1986) (noting that §§ 4862 and 4865 "make recordation within the time specified in Section 4862 a requirement for preservation of the privilege"). Thus, in order to insure priority for a mortgage, a bank would only need to check to see which contractors had worked during the past six months. These contractors would presumably have liens with priority. Those contractors who had not worked in the last 180 days would have either recorded their privilege or lost it. Not such an onerous burden on the bank, after all.[1]

As often happens when a court considers the meaning of statutory language, this case presents "dueling" canons of statutory interpretation. *See generally* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed*, 3 Vand. L.Rev. 395 (1950); Symposium, *A Reevaluation of the Canons of Statutory Interpretation*, 45 Vand. L.Rev. 529 (1992). The Bank points to cases which hold that "lien statutes are stricti juris and should thus be strictly construed." *Guichard Drilling Company v. Alpine Energy Services, Inc.*, 657 So.2d 1307, 1313 (La.1995). On the other hand, according to the Louisiana Civil Code, article 18, "The universal and most effectual way of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it." On this point, the Louisiana Supreme Court has recently held:

> It is clear the purpose of the Oil Well Lien Act is to protect those ... who contribute labor, services, and equipment to the drilling of wells from the default of those who

engage them. The legislature has clearly placed the risk of the contractor's insolvency or failure to pay on those with an interest in the lease. The legislature has made a policy decision that the lease owners are in a far better position to ensure payment for the subcontractor's services than is the subcontractor, and that the onus should be on the lease owners to ensure that the contractor it hires is solvent and that it actually makes payment to the subcontractor.

*Guichard*, 657 So.2d at 1312–13 (citations omitted). For the same policy reason, the burden falls on a bank when contractors who have been constructing and operating a well, and thus enhancing the value of the bank's collateral, do not get paid by the lease owner. Of course, this is only true for contractors who were already on the job before the bank took an interest in the property. Contractors who come along after the bank has gotten a consensual mortgage will know from the public records that their statutory liens do not have priority. Presumably, these late-coming contractors will be less likely to work for long periods without being paid.

■ At common law, oil and gas well contractors had no right to recover against the well and its proceeds. The first Louisiana oil well lien act, in 1916, changed that. *See Louisiana Materials Co. Inc. v. Atlantic Richfield Co.*, 493 So.2d 1141, 1146 n. 5 (La. 1986). The general purpose of materialman's lien statutes is to give contractors a lien that is unprimeable by subsequently entered consensual mortgage agreements. No policy supports a reading of the Lien Act that would allow a contractor's lien to lose priority simply because the owner paid the contractor in full until granting a consensual mortgage to a bank and only then stopped paying the contractor. The point of the materialman's lien is that the contractor is covered for the whole project. Lenders who extend credit after work has begun know that contractors who have already begun work will get paid before they do. While the Bankruptcy Court said that this arrangement "turns the com-

---

1. As detailed below, section 4864(C) of the amended Lien Act assigns separate rank dates to privileges that are based on activities or events between which more than ninety consecutive days have elapsed. Thus, banks have an even lower burden under the new act.

mercial world on its heels [sic]" (the phrase is "turn on its head," not "heels"), it did not appreciate that the contractors who work on these projects are commercial "lenders" in a sense—they lend their labor and services with the knowledge that the value is secured by the value of the project to which they are contributing. The burden should not be on contractors to periodically check the public records to make sure their liens have not been primed by a subsequently entered consensual mortgage. Although banks may be the most frequent major creditors making claims in bankruptcy courts, and their lawyers prominent members of the local bankruptcy bar, other creditors are no less "commercial" actors, and the "commercial world" is not "turned on its heels" when a statute gives other lienholders priority over banks.

■ The public policy argument in favor of contractors is supported by reference to the revised and amended Louisiana Oil, Gas, and Water Wells Lien Act that was passed in 1995. Section 4862 defines the scope of the privilege for labor, services, or supplies:

The following persons have a privilege over the property described in R.S. 9:4863 to secure the following obligations incurred in operations:

(1) A contractor for the price of his contract for operations.

. . .

(4) A person who performs trucking, towing, barging, or other transportation services for an operator or contractor, for the price of transporting movables to the well site.

(5) A person who transports, to or from a well site located in the waters of the state, persons who are employed in rendering labor or services on the well site, for the price of transporting those persons.

La.Rev.Stat. 9:4862(A) (1996). Thus, under the new Lien Act the privilege clearly secures the entire cost of labor or services, not just any unpaid amounts. Furthermore, "The privilege in favor of a claimant is established and is effective as to a third person when: (1) the claimant, who is a contractor, laborer, or employee *begins rendering services at the well site.*" La.Rev.Stat.

9:4864(A) (emphasis added). The new act also contains an explicit section on the ranking of privileges:

The privileges granted by this Part are superior in rank and priority to all other privileges or mortgages against the property they encumber except the following which are of superior rank and priority:

. . .

(2) Mortgages . . . on the operating interest and other property affected by such mortgages . . . that are effective as to a third person before the privilege is established.

La.Rev.Stat. 9:4870(B). Finally, the new statute makes clear the investigative obligations facing a prospective lender, who must only search for work done in the last ninety days:

All obligations owed to a claimant arising from operations on the same operating interest, without a lapse of more than ninety consecutive days between an activity or event that establishes the privilege . . ., are secured by a single privilege. . . . If more than ninety consecutive days elapse between such activities or events, the privileges established before and those established after such time are separate.

La.Rev.Stat. 9:4864(C).

■ Under Louisiana law, the new Oil Lien statute is not retroactive. La.Rev.Stat. 1:2. ("No Section of the Revised Statutes is retroactive unless it is expressly so stated."); La. Civ.Code art. 6. ("In the absence of contrary legislative expression, substantive laws apply prospectively only."). *See also Mitchell v. Dixie Roofing & Sheet Metal Co.,* 663 So.2d 222, 227 (La.App.1995) ("A substantive law creates, confers or destroys rights, causes of action or legal duties."). But even though it is not retroactive, the new statute confirms the policy choice that the Louisiana Supreme Court in *Guichard* ascribed to the legislature: "to protect those . . . who contribute labor, services, and equipment to the drilling of wells from the default of those who engage them." 657 So.2d at 1312. Of course, statutory interpretation based on amended statutes is tricky. It can be argued

that a new statute shows an intent on the part of the legislature to reverse course or, conversely, that the legislature knew what it was doing all along. In the present case, based on the fact that general materialman's lien statutes favor contractors over lenders who extend money after work has begun, we read the new statute as consistent with the older law.

This Court therefore reverses the court below and remands this case to the Bankruptcy Court for proceedings to carry out the priority established by this opinion. The Bankruptcy Court should determine whether Appellants' privileges are valid under the relevant provisions of the pre–1995 Lien Act, an issue specifically reserved by the Bank in its motions for summary judgment. If valid, Appellants' privileges will have priority from the date of first work, rather than from the date of first unpaid service.